UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Nilsa Ivette Agrait,

      Plaintiff,

v.                           CASE NO. 8:23-cv-01555-SDM-SPF

Hillsborough County Public Schools,

      Defendant.

_____/

## ORDER

Nilsa Ivette Agrait sues (Doc. 1) her former employer, Hillsborough County Public Schools (the school board) and asserts claims for disability discrimination, failure to accommodate, and retaliation. The school board moves (Doc. 61) for summary judgment on each claim. Agrait responds (Docs. 62, 64).

## BACKGROUND

From 1993 to 2022, Agrait worked for the school board as a speech language pathologist or SLP. (Doc. 61-3 at 104:22) Five years into her employment with the school board, Agrait was diagnosed with multiple sclerosis, a chronic autoimmune disease affecting the central nervous system. (Doc. 61-3 at 104:23) To overcome vision and mobility problems caused by her multiple sclerosis, Agrait relied on eyeglasses and either a walker or an electric scooter. (Doc. 61-3 at 132:4-6) Also, she had a handicapped parking space throughout her employment with the school board and was granted medical leave on numerous occasions during her employment to

manage "flare ups" of her multiple sclerosis. (Doc. 61-1 at ¶11; Doc. 61-3 at 32:2 Doc. 61-3 at 97:19)

As an SLP, Agrait provided speech and language instruction for kindergarten through twelfth grade exceptional student education (ESE) and for non-ESE students. (Doc. 61-2 at ¶4; Doc 61-1 at Ex. I; Doc. 61-3 at 65:3-19) ESE students range in age from three to twenty-one and have a diagnosis of developmental delay. (Doc. 61-2 at ¶4; Doc. 61-3 at 74:16-76:8) Also, the ESE program includes "Access students" who exhibit a cognitive disability and require assistance with routine tasks. (Doc. 61-3 at 74:16-76:8) Some are completely non-verbal. (Doc. 61-3 at 143:6-8)

Agrait was to follow the expectations for "[a]ll district employees," which include "regular and predictable attendance." Agrait's official job description, issued in 2012, specifies that "[p]hysical presence is a part of a reliable and predictable pattern of attendance."[1] (Doc. 61-1 at Exhibit I)  Additionally, the "Hillsborough County Public Schools Policy Manual," dated June 23, 2015, provides "Regular attendance is an essential function of all employees. All employees who are absent from duty must be on approved leave. Any employee who is absent from duty without approved leave may be subject to disciplinary action up to and including dismissal." (Doc. 61-1 at Exhibit C) Finally, the same policy manual requires that both instructional staff members and support staff members "shall maintain a standard of care for

---

[1] During her deposition, Agrait acknowledged that her physical presence was expected at the workplace. (Doc. 61-3 at 66:20)

- 2 -

the supervision, control, and protection of students commensurate with their as-signed duties and responsibilities." (Doc. 61-1 at Exhibits D-E)

In response to the COVID-19 pandemic, the school board adopted online learning and temporarily loosened the longstanding expectation of a school board employee's physical presence at work. During the 2020–21 school year, Agrait pro-vided her services "virtually" and the students she taught participated "virtually." (Doc. 61-3 at 84:12-86:4) However, by the 2021–2022 school year, Agrait's students attended school in-person, and Agrait was again required to service them in-person as she had for more than two decades before the pandemic. (Doc. 61-3 at 84:12-86:4)

In 2021, Agrait went to the hospital on two occasions: she was admitted in August due to COVID-19 complications and again in December due to a stomach virus. (Doc. 61-3 at 87:24; Doc. 61-3 at 101:21). Both ailments exacerbated Agrait's multiple sclerosis: her vision and balance worsened, she was unable to drive a long distance,[2] and her energy level dropped unpredictably. (Doc. 61-1 at ¶14; Doc. 61-3 at 129:24-130:4) After the second hospitalization, Agrait was fearful that returning to in-person work risked further illness and might further exacerbate her multiple sclero-sis. (Doc. 61-3 at 144:5-6) The School board does not dispute any of Agrait's de-scribed symptoms or their effect on Agrait's ability to drive to work. (Doc. 61 at 4-5)

---

[2] In her deposition, Agrait states that "it would be impossible" to drive to work on her own. (Doc. 61-3 at 118:10-11)

On December 31, 2021, and again on January 20, 2022, even though her students had returned to in-person classes, Agrait submitted requests to work from home indefinitely. (Doc. 61-1 at ¶13; Doc. 61-1 at Exhibits E-F; Doc 61-2 at ¶8; Doc. 61-2 at Exhibit J; Doc. 61-3 at 112:3-113:4; 120:5-121:11) In support of these requests, Agrait submitted two doctor's notes dated January 14, 2022 and March 7, 2022. The first note states, "Please accommodate patient to work from home given her increased symptoms from her Multiple Sclerosis." (Doc. 61-1 at Exhibit E) The second note states, "Patient continues to report significant dizziness and is unable to drive at this point. Please accommodate her to work from home. Please also minimize sources of stress given her neurological diagnosis of Multiple Sclerosis." (Doc. 61-1 at Exhibit F)

In addition to the doctor's notes, Agrait provided a proposal for the school board to implement a "Pilot Program" (which, as Agrait admits, "has never been done anywhere in the nation") that would enable her to provide her services virtually. (Doc. 61-1 at Exhibit E; Doc. 61-3 at 123:19-20) This program would require the School board to assign an employee to chaperone students attending virtual diagnostic sessions conducted remotely by an SLP working from home. (Doc. 61-2 at ¶9; Doc 61-3 at 128:18-21) This meant the necessity of two or more employees to do what formerly required only one. (Doc. 61-2 at ¶9; Doc 61-3 at 134:17-21)

Agrait's requests to work from home were denied on January 13, 2022, and again on January 25, 2022. (Doc. 61-1 at ¶15; Doc. 61-1 at Exhibit E; Doc. 61-2 at ¶10; Doc. 61-2 at Exhibit J) School board staff encouraged Agrait to discuss with her

doctor possible accommodations to enable her to work at school. (Doc. 61-1 at ¶15; Doc. 61-1 at Exhibit E) Staff instructed that if she could not return to the workplace, Agrait should contact a school board leave specialist to explore leave options. (Doc. 61-1 at ¶15; Doc. 61-1 at Exhibit E)

As an accommodation, the school board offered her a walker or other device to help with her balance, offered her options to magnify documents to help her see, offered her a dedicated handicapped-parking space, offered to move her office closer to her dedicated parking space to minimize travel, offered her transfer to a Hills-borough Virtual School ("HVS") SLP position if one were to become available (be-tween January 2022 and April 2022 one was not available), and offered her medical leave. (Doc. 61-1 at ¶16; Doc. 61-3 at 130:15-22, 131:3-19, 132:10-24) Agrait re-sponded that she did not need to use a walker or a device to magnify documents be-cause she already used a scooter and eyeglasses. (Doc. 61-1 at ¶17; Doc. 61-3 at 130:15-22, 132:10-17) Agrait rejected the other proposed accommodations. (Doc. 61-1 at ¶17)

Between February 4 and February 11, 2022, Agrait attempted to work re-motely with the assistance of school personnel who were unaware Agrait's work-from-home requests had been denied. (Doc. 61-1 1 at ¶18; Doc. 61-2 at ¶¶11-12; Doc. 61-3 at 137:16-138:22) Specifically, Agrait directed personnel to put ESE students in front of a computer at their designated start time and have the regular students go to a separate area of the school for their SLP sessions. (Doc. 61-2 at ¶12; Doc. 61-3 at 140:3-23.)

- 5 -

One teacher complained to Agrait about this arrangement, including that she was unsure the arrangement met the students' needs, that only one paraprofessional was available to facilitate the virtual sessions, and that the arrangement left affected employees susceptible to liability. (Doc. 61-3 at 141:3-8, 21-23, 142:1-143:8) Agrait conceded that these objections were "valid." (Doc. 61-3 at 143:15-16) On February 17, 2022, learning Agrait was working from home without approval, school board staff emailed Agrait and again informed her that remote work was unacceptable, that Agrait was not approved to work from home, and that Agrait was marked "absent" when she did not report to work on campus. (Doc. 61-1 at ¶19; Doc. 61-1 at Exhibit G; Doc. 61-3 at 144:2-17)

Agrait later complained that she was not paid her full salary for the week of February 7 through 11, 2022 while she worked remotely without approval. (Doc. 61-1 at ¶21) The school board reviewed the matter and paid Agrait her full salary for each day she performed work, specifically, February 8, 9, and 11, 2022. [3] (Doc. 610-1 at ¶21) Because Agrait never returned to work or initiated a leave of absence, she received no paycheck, in accord with the school board's February 17, 2022 email. (Doc. 61-1 at ¶22; Doc. 61-3 at 144:15-17)

Consequently, on March 8, 2022, Craig Horstman, the General Manager of Personnel Services, mailed Agrait a letter stating that she was absent without leave since January 3, 2022, that she was told several times that remote work was not an

---

[3] These were the days of the remote classes that Agrait was not even authorized to conduct.

option, that she must return to work or take a leave of absence, and that she was in violation of the school board's attendance policy. (Doc. 61-1 at ¶23; Doc. 61-1 at Exhibits C and H; Doc. 61-3 at 150:18- 152:13) This letter instructed Agrait to discuss with Mr. Horstman her options to remain employed. (Doc. 61-1 at Exhibit H)

On March 21, 2022, Agrait spoke to Mr. Horstman on the telephone, confirming that her options were return to work in-person (with accommodations as needed), take a leave of absence, retire, or resign. (Doc. 61-1 at ¶24; Doc. 61-1 at Ex. H; Doc. 61-3 at 152:14-25) Mr. Horstman further informed Agrait that, if she refused all acceptable options, termination would result. (Doc. 61-1 at ¶24; Doc. 61-1 at Exhibit H) Agrait refused all the options but continued to insist on the option to work from home. (Doc. 61-3 at 153:13-16, 154:13-155:18) On April 1, 2022, Agrait's employment was terminated. (Doc. 61-1 at ¶25; Doc. 61-1 at Ex. H; Doc. 61-3 at 156:12-18)

After Agrait's termination, she brought this action, alleging that the school board discriminated and retaliated against her based on her multiple sclerosis because (i) the school board failed to accommodate her request to work from home, (ii) failed pay her for two days of work, and (iii) terminated her. (Doc. 1; Doc. 61-3 at 159:10-160:7, 161:20-25, 162:25-163:2, 164:14-23)

## DISCUSSION

### 1. Count I and II – Disability Discrimination

The ADA prohibits a covered employer's discriminating against "a qualified individual with a disability because of the disability of such individual" in any of the

"terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). To estab-

lish a prima facie case, Agrait must allege (1) that she has a disability, (2) that she is a

qualified individual, and (3) that the defendant unlawfully discriminated against her

because of the disability. *Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n. 3, 124 S.Ct.

513, 157 L.Ed.2d 357 (2003); *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1225–26

(11th Cir.2005).

"The term 'qualified individual' means an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. § 12111(8). Agrait must

show either that she can perform the essential functions of her job without accommo-

dation or show that she can perform the essential functions of her job with a reasona-

ble accommodation. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th

Cir. 2000). If Agrait is unable to perform an essential function of her SLP job with a

reasonable accommodation she is by definition not a "qualified individual" and not

covered under the ADA. In other words, the ADA permits the schoolboard to main-

tain an "essential function of Agrait's job." *See Davis*, 205 F.3d at 1305; *see also*

*Cramer v. Florida*, 117 F.3d 1258, 1264 (11th Cir.1997). Therefore, the first issue is

whether in-person attendance is an essential function of the SLP position.

"Whether a function is essential is evaluated on a case-by-case basis by exam-

ining a number of factors." *Davis*, 205 F.3d at 1305. The ADA prescribes considera-

tion of both the employer's judgment as to what functions of a job are essential and

the employer's written description of the job. 42 U.S.C. § 12111(8); *see also Marquez v.*

*Costco Wholesale Corp.*, 550 F. Supp. 3d 1256, 1282 (S.D. Fla. 2021) (citing *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1258 (11th Cir. 2007)) (finding that in determining whether a particular job duty is an essential function of a position, a court is required by statute to consider a written job description and will give it substantial weight). Regulations issued under the ADA provide for consideration of other factors, including (1) the employer's judgment as to which functions are essential, (2) a written job description prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, and (4) the consequences of not requiring the incumbent to perform the function. 29 C.F.R. § 1630.2(n)(3).

Considering the relevant factors, in-person attendance was an essential function of Agrait's SLP position. First, the applicable statutory, regulatory, and case law accord substantial weight to Agrait's written job description and other evidence of the school board's judgment about essential functions. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3); *Marquez*, 550 F. Supp. 3d at 1282. The pertinent descriptions include (1) section 3430 of the Hillsborough County Public Schools Policy Manual, which provides that "[r]egular attendance is an essential function of all employees"; (2) sections 3213 and 4213 of the same manual which provide that each instructional and support staff member "shall maintain a standard of care for the supervision, control, and protection of students commensurate with their assigned duties and responsibilities; and (3) the job description for Agrait's position, which provides that "All district employees must . . . [d]emonstrate regular and predictable attendance.

- 9 -

Physical presence is a part of a reliable and predictable pattern of attendance." (Doc. 61-1 at Exhibit C, D-E, I)

Also, "substantial weight" is accorded to the "employer's view" as to which functions are essential. *Holly*, 492 F.3d at 1258. The affidavit of Danielle Shotwell, General Manager of Employee Relations for the school board, affirms the school board's expectation of an employee's presence on the job to adequately ensure the safety of students. Shotwell's January 1, 2022 email to Agrait, in which she instructs Agrait "to discuss with [her] Doctor if there are accommodations that can be put in place at the job site to assist [her] to work on site" further demonstrates that the school board considered in-person attendance an essential function of Agrait's position. (Exhibit 61-1 at Exhibit E)

The third regulatory factor, "the amount of time spent on the job performing the function," disfavors Agrait because her "physical presence" was expected each day of her job. (Doc. 61-1 at Exhibit I)

Finally, we turn to the "consequences of not requiring [Agrait] to perform the function" of in-person attendance. As an SLP, Agrait worked with in-person students. (Doc. 61-2 at ¶5; Doc. 61-2 at Exhibit I) Each day, she met approximately twenty students in her office and without assistance, unless a specific student required a one-on-one aide. (Doc. 61-3 at 79:2-6, 79:22-80:11) Agrait acknowledges the importance of adult supervision for the students, especially if an emergency occurs or if the student is un-cooperative. (Doc. 61-3 at 127:25-128:6) Therefore, if Agrait is not present in-person to meet with an in-person student, the school board must

- 10 -

provide another physically present adult during the SLP session to supervise her students. (Doc. 61-2 at ¶9; Doc. 61-3 at 128:18-21)

Moreover, because Agrait was the only SLP working for Durant and Marshall during the 2021–2022 school year, a "critical shortage" of SLPs resulted. (Doc. 61-2 at ¶7; Doc. 61-3 at 34:24-25, 62:8-10, 72:10-15) These factors strongly suggest that in-person attendance is an essential function of Agrait's position. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997) (noting the likelihood that a specific duty is an essential function of the job if only a limited number of employees are available to perform the job and the function is so highly specialized and an employee is hired for their ability to perform the particular job).

Because the parties agree that Agrait was unable to work in-person without accommodations (which she refused), she is not a "qualified individual" and her discrimination claims fail as a matter of law unless she can demonstrate that she can perform the essential functions of her job with reasonable accommodation. *See Holbrook,* 112 F.3d at 1526.

Here, the only accommodation Agrait requested was to work from home indefinitely. (Doc. 61-1 at ¶20; Doc. 61-3 at 119:11-120:1) But, as discussed, Agrait's in-person attendance was an essential function of her position and eliminating the essential functions of a position is per se unreasonable. *See Leme v. Southern Baptist Hosp. of Fla., Inc.*, 248 F. Supp. 3d 1319, 1345-46 (M.D. Fla. 2017); *see also Morris-Huse v. GEICO*, 748 F. App'x 264, 266–67 (11th Cir. 2018) (finding the plaintiff's

work from home request unreasonable because the plaintiff could not perform the essential functions of her position).

Moreover, allowing Agrait to work from home would require the school board to hire a physically present employee during Agrait's SLP sessions to chaperone the students. (Doc. 61-2 at ¶9; Doc. 61-3 at 128:18-21) This would require two people for the job of one.[4] (Doc. 61-2 at ¶9; Doc. 61-3 at 134:17-21) In addition, not all students are suited for virtual therapy services due to developmental or behavioral problems. For these reasons, allowing Agrait to work remotely was not a reasonable accommodation, which means that her prima facie claim for discrimination under the ADA fails as a matter of law.

## II. Count III – Retaliation

To establish a retaliation claim under the ADA, a plaintiff must show (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal relation exists between the adverse action and her protected expression. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

Here, the school board concedes that Agrait engaged in the protected conduct of requesting accommodations and ultimately suffered the adverse employment action of termination. (Doc. 61 at 20) But Agrait has presented no direct evidence that

---

[4] *See Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 943 (11th Cir. 2017) (finding that plaintiff's requested accommodation of working exclusively from home was not reasonable as other employees would have had to take on the in-person aspects of plaintiff's job).

her termination was motivated by retaliatory animus,[5] and the only circumstantial evidence of retaliation she has presented is the timing of her termination.  But "mere temporal proximity, without more, must be very close." *Rives v. Lahood*, 605 F. App'x 815, 19 (11th Cir. 2015) (finding that "a three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."). Accordingly, timing between Agrait's requests to work from home in December 2021 and January 2022 and her termination in April, absent other evidence, was not suspect enough to satisfy the causation prong of her retaliation claim. As such, Agrait's retaliation claim likewise fails for failure to establish a prima facie case.

## CONCLUSION

The school board's motion for summary judgment (Doc. 61) on each of Agrait's claims is **GRANTED**. The clerk must enter judgment for the defendant against the plaintiff and **CLOSE** the case.

ORDERED in Tampa, Florida, on September 30, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[5] In fact, the direct evidence presented by Agrait supports the school board's position that Agrait was terminated for legitimate, non-discriminatory reasons (i.e., her sustained failure to show up to her job or take a leave of absence). (Doc. 61-1 at ¶¶19, 21, 23-25; Doc. 61-1 at Exhibit H; Doc. 61-3 at 134:22-135:5, 153:4-16)